# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No: 03 CR 962 |
| | ) | |
| MARTIN CALDWELL | ) | Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

The United States of America (the "Government") brought a five-count indictment against Defendant, Martin Caldwell, and a co-defendant, Melvin Saffold. Count I alleged that between February 1998 and continuing until October 2003, Defendant and Saffold conspired to distribute and possess with intent to distribute narcotics. Count II alleged that on August 24, 2001, Defendant knowingly and intentionally distributed narcotics. Count III alleged that on August 8, 2002, Saffold knowingly and intentionally distributed narcotics. Count IV alleged that on September 23, 2002, Defendant and Saffold knowingly and intentionally possessed with intent to distribute narcotics. Count V alleged that on October 15, 2003, Defendant knowingly possessed a firearm despite having been previously convicted of a felony. On April 21, 2004, Defendant was arraigned. On May 20, 2004, the Government voluntarily dismissed Count II of the indictment, relating to the August 24, 2001 offense. Defendant, in a separate case before another judge in this district, previously had been charged and convicted as a felon on possession of a firearm.

Presently before the Court are three motions by Defendant: (1) a Motion to Dismiss the Indictment Based on the Due Diligence Exception of Separate Trials; (2) a Motion to Suppress Title III Material; and (3) a Combined Motion to Dismiss for a Defective Grand Jury and for Disclosure of Grand Jury Material. For the following reasons, those motions are denied.

## BACKGROUND

Federal agents began to investigate Defendant in 1998, after Defendant's mother was kidnaped and Defendant advised police that he could raise $100,000.00 after a ransom demand. Defendant obtained the money within a few hours but refused to provide police with an explanation of how he did so. Shortly thereafter, federal agents, acting on a search warrant, found three firearms at Defendant's home, approximately $57,000.00, and marijuana packaged for resale. The discovery of the guns ultimately resulted in the previous indictment and a conviction on firearms charges after a jury trial in *USA v. Caldwell*, 03 CR 899, mentioned above.

The Government continued to investigate Defendant on drug charges, and a cooperating witness contacted the Drug Enforcement Administration ("DEA") concerning Defendant. This witness stated that Defendant was a member of the Conservative Vice Lord's street gang; that he had purchased cocaine from Defendant on a weekly basis for five years; that drug transactions were often conducted over Defendant's cellular phones; and that he knew an individual, later identified as Co-Defendant Melvin Saffold, who distributed narcotics for Defendant.

On August 24, 2001, in a videotaped transaction, the witness purchased approximately 100 grams of crack cocaine from an individual believed to be Defendant; however, the seller was not Defendant.

On July 9, 2002, Ed Smith was arrested on drug charges. He agreed to cooperate with law enforcement officials and told agents that he was a member of the Vice Lord's street gang, that he knew Defendant, and that he had purchased crack cocaine from Defendant for a number of years. Smith stopped purchasing narcotics from Defendant when Smith learned Defendant was being investigated by federal agents. Smith told the police that in mid-June 2002, he contacted Defendant concerning a loan. Defendant did not loan Smith money but provided Smith with a kilogram of cocaine. Smith agreed to pay Defendant $20,000.00 for the cocaine and Saffold delivered the cocaine to Smith. Smith then made a recorded call to Defendant to arrange for the payment of the kilogram of cocaine and the purchase of more cocaine. On July 15, 2002, in an unrecorded call from an unspecified telephone, Defendant later contacted Smith concerning the payment. While the DEA conducted surveillance, Defendant and Smith then met concerning the payment. Thereafter, Defendant called Smith several times concerning the payment; and on July 30, 2002, under the direction of DEA agents, Smith conducted a controlled delivery of $10,000.00 in purported drug proceeds to Defendant. After the transaction, Defendant sped away, but the money was later seized by law enforcement officers in a traffic stop. After the traffic stop, Defendant called Smith to complain that Defendant was set up by Smith.

Thereafter, on August 8, 2002, the cooperating witness purchased 100 grams of crack cocaine from Saffold. Saffold told the witness that he would be able to sell 4-1/2 ounces of crack cocaine and instructed the witness to meet in front of Saffold's house. DEA agents provided the cooperating witness with a recording device and money for the narcotics. Agents saw the

witness drive to Saffold's house and pick up Saffold. Saffold and the witness then drove around the block. A few minutes later, the car returned, and Saffold went back into his house. Agents met with the witness, retrieved the narcotics, and confirmed that the substance in the bag contained cocaine.

On September 11, 2002, the Government then obtained an order from Chief Judge Charles Kocoras, authorizing the interception of wire communications occurring to and from a cellular telephone used by Defendant. The affidavit provided in support of the application included, *inter alia*, reference to the videotaped drug purchase made by the cooperating witness on August 24, 2001, which mistakenly identified the seller as Defendant. The inclusion of the August 24, 2001 drug transaction, in part, forms the basis of Defendant's challenge to the September 11, 2002 order and subsequent wiretap conversations. However, the affidavit contained a number of other facts relating to probable cause:

> The application accompanying this affidavit seeks authority to intercept wire communications occurring to and from **Target Phone 4** which telephone is believed to be used by MARTIN CALDWELL, a member of the Conservative Vice Lord's Street gang, to facilitate the distribution of multi-kilogram quantities of cocaine and crack cocaine on Chicago's West Side. As set forth in more detail below, [Smith] has placed numerous calls to **Target Phone 4** and talked with MARTIN CALDWELL about narcotics and debts related to narcotics. These phone calls, along with information provided by [Smith] regarding CALDWELL's narcotics dealings, have been corroborated by, among other things: (i) [deleted]; (ii) controlled purchases of narcotics from [deleted] and MELVIN SAFFOLD, an individual believed to work with MARTIN CALDWELL; (3) consensually recorded conversations between [Smith] and MARTIN CALDWELL; (4) the seizure of money from MARTIN CALDWELL after [Smith] delivered the money to MARTIN CALDWELL as payment for a drug debt; and (v) financial records showing large amounts of unexplained wealth attributable to MARTIN CALDWELL. Moreover, pen register and trap and trace information reflects numerous contacts between **Target Phone 4** and telephone numbers associated with individuals who, based on criminal histories, confidential

4

source information and surveillance, are believed to be involved in the purchase and sale of narcotics. Therefore, it is believed that MARTIN CALDWELL is using and will continue to use **Target Phone 4** to facilitate the named offenses.

Wiretap Affidavit ¶ 6.

Furthermore, the application also referred to IRS records which demonstrated that Caldwell's approximate income for each of the two years preceding the kidnapping and the payment of the $100,000.00 ransom never exceeded $62,000.00.

Paragraphs 33 through 41 of the affidavit recount pen register information that demonstrates Defendant's phone was making numerous calls to other individuals participating in a drug trafficking network; and, many of those people, including Saffold, had provided narcotics to individuals cooperating in the DEA's investigation.

Specific information, which has been discussed above, was also set out in detail in the affidavit.

The affidavit, in paragraphs 42 through 59, also discussed the necessity for a Title III wiretap, rather than the use of arrests, physical surveillance, grand jury subpoenas, confidential sources, undercover agents, interviews, search warrants, and review and analysis of telephone records. Certain techniques had been tried but were ineffective because: (1) the cooperating witness and Smith were only useful in discrete transactions and were not able to fully identify all members of the conspiracy; (2) Defendant did not like to discuss the conspiracy's business in detail with the cooperating witness unless it involved a particular activity; (3) Defendant is very leery of Smith after the government seizure of the $10,000.00 drug payment, thereby limiting Smith's value as an informant; (4) surveillance targets, who do not trust anybody outside of their group, were very surveillance conscious; (5) the surveillance consciousness of the conspirators

was only heightened by the traffic stop and seizure of $10,000.00 from Defendant; (6) any recordings made by the informants were very short in duration, only concern discrete drug transactions, and failed to identify other members of the conspiracy; and (7) pen registers do not identify the parties to the conversation, do not include the substance of the conversations, and cannot differentiate between criminal and non-criminal calls. Other techniques reasonably appeared to be unlikely to succeed if tried because: (1) co-conspirators are criminally culpable and would be unlikely to provided truthful statements to the Government during interviews; (2) the investigation could be compromised if Defendant or other targets were arrested; (3) any co-conspirators would probably be uncooperative and invoke their Fifth Amendment privileges at a grand jury; (4) service of grand jury subpoenas would cause targets to become more cautious; (5) search warrants would not result in the seizure of a substantial amount of narcotics and currency or provide evidence of the full scope of the conspiracy; (6) the exercise of search warrants would compromise the investigation.

The wiretap on Defendant recorded many calls detailing drug transactions. One series of calls occurred after DEA agents stopped Saffold based upon information from the cooperating witness stating that Defendant had directed Saffold to deliver cocaine. DEA agents recovered 283 grams of powder cocaine from Saffold, and he was placed under arrest by Chicago Police officers. A few minutes later, Defendant received a voice mail which was intercepted. The caller informed Defendant to check on Saffold because officers had arrested Saffold. The next day, Defendant spoke with another individual concerning the arrest of Saffold.

Defendant was later arrested, and another firearm was seized. At that time, two cases were pending against him: (1) the firearms indictment previously referred to and (2) a criminal

6

complaint in the instant case regarding the drug trafficking conspiracy. The indictment on the firearms charge was returned two weeks prior to the issuance of a criminal complaint in the drug trafficking matter.

Count II of the indictment in this case charged Defendant with distribution of over 50 grams of crack cocaine and was based on the August 24, 2001 transaction between the cooperating witness and the seller mistakenly identified to be Defendant. However, after reviewing the tape in preparation to provide discovery, the Government learned that Defendant was not involved in the videotaped transaction. The Government, prior to Defendant's arrest, had a photograph depicting only Defendant's head and shoulders. The Government contacted Defendant's counsel to advise Defendant of the error, and Count II was dismissed by the Government on May 20, 2004, four weeks after Defendant was arraigned on April 21, 2004.

## ANALYSIS

*Due Diligence*

Defendant argues that this matter should be dismissed under the Fifth Amendment's Double Jeopardy clause because: (1) the drug charges relate to the prior firearms conviction and (2) the drug charges could have been brought at the same time of the firearms charges, but for the Government's lack of due diligence. In support of this contention, Defendant cites *United States v. Binker*, 766 F.2d 695 (11th Cir. 1986) (*Binker*), and the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

The court in *Binker*, however, held that it was not deciding the issue of whether the Government's failure to exercise "due diligence" in bringing separate prosecutions could result

in a reversal. *Binker*, 799 F.2d 696. Furthermore, the drug charges and the firearms charges arise out of separate factual events. The firearms charges only involved the search of Defendant's home after the kidnapping of Defendant's mother, while the drug charges involve a drug trafficking conspiracy taking place from 1998 to 2003. The Double Jeopardy clause, which provides "nor shall any person be subject to the same offence to be twice put in jeopardy of life or limb," therefore does not bar prosecution of these drug trafficking charges. *See, e.g., Garrett v. United States*, 471 U.S. 773, 789-92 (1985).

Moreover, on numerous occasions, Defendant's attorneys, including his present attorney, consented to extensions of grand jury proceedings regarding the drug charges while Defendant considered cooperating with the Government.[1] The Government provided Defendant with a general outline of the charges involved in the drug trafficking conspiracy, and Defendant never requested the prosecution of these charges be joined with the felon in possession of a firearm charge. If Defendant had a right to defend the firearm and drug charges in one proceeding, he has clearly waived it. Accordingly, Defendant cannot now object to the timing and sequence of the return of the indictments or the prosecution thereof by the Government based on his previous conduct.

---

[1] Defendant pled guilty to Counts I and II of a superceding information pursuant to a plea agreement on July, 17, 2004. The plea agreement specifically referred to the previous conviction of possession of a firearm by a felon. The plea agreement was later held to be void, and Defendant's guilty plea was vacated.

*Motion to Suppress*

Defendant seeks to suppress the Title III interceptions because: (1) the application, on its face, lacked probable cause; (2) the Government agent committed misconduct by including false information in the Title III affidavit; and (3) the Government failed to prove the necessity for a Title III affidavit. At oral argument, Defendant also sought a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (*Franks*), concerning the Government's alleged misconduct.

Under 18 U.S.C. § 2518(3), a judge may issue an *ex parte* order approving the interception of wire communication if:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
> 
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
> 
> (c) normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
> 
> (d) there is probable cause for belief that the facilities from which, or the places where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The probable cause standard in Title III cases uses the same probable cause standard applied in Fourth Amendment determinations. *See United States v. Zambrana*, 841 F.3d 1320, 1332-33 (7th Cir. 1988) (*Zambrana*). This test requires a court to examine the totality of the circumstances and "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence

of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the judge had a substantial basis for concluding that probable cause existed." *Zambrana*, 841 F.2d 1332 (internal alterations omitted) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

Defendant argues that, because of the inclusion of the erroneous identification of Defendant in the August 24, 2001 drug deal in the application, probable cause did not exist that: (1) Defendant was committing drug crimes or (2) use of a wiretap would elicit information concerning drug crimes. However, excluding the details of that drug transaction and based on the totality of the remaining circumstances, a substantial basis remains for concluding probable cause to support the Title III application.

As detailed above, this evidence consisted of: (1) controlled purchases of narcotics from Saffold, who was involved with drug trafficking; (2) consensually recorded conversations between Smith and Defendant discussing drug transactions; (3) the seizure of money from Defendant that Smith had delivered; (4) financial records showing large amounts of unexplained income attributable to Defendant; and (5) statements and recordings from witnesses demonstrating that Defendant conducted drug transactions over cellular phones. Pen register and trap and trace information, reflecting numerous contacts between Defendant's cell phone and telephone numbers associated with individuals involved in the purchase and sale of narcotics, were also provided. "[S]uch phone records and pen register information often raise an inference of criminal activity that supports authorization of a Title III intercept order." *United States v. Hanhardt*, 157 F. Supp. 2d 978, 988 (N.D. Ill. 2001).

Defendant next argues that the motion to suppress should be granted because the Government committed misconduct in submitting the affidavit. According to Defendant, the government agent either lied or showed reckless disregard for the truth in obtaining the wiretap by including a drug transaction in which Defendant did not participate. Defendant also contended, at oral argument, that this misconduct required a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154 (1978).

To obtain the requested relief, Defendant must demonstrate that: (1) the affidavit contained a false statement; (2) the agent's state of mind in submitting the false statement was at least reckless; and (3) "that the false statement was material, i.e., necessary for a finding of probable cause." *United States v. Jackson*, 103 F.3d 561, 574 (7th Cir. 1996). "If the material that is allegedly false is set aside, and 'there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.'" *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003) (quoting *Franks*, 438 U.S. at 171-72).

As discussed above, the Government has demonstrated that sufficient probable cause exists to grant the Title III application even without the inclusion of the August 24, 2001 drug transaction mistakenly identifying Defendant as the seller. As such, Defendant is not entitled to a *Franks* hearing or a suppression of the wiretap information based upon the Government's misconduct. Moreover, there has been no showing that the agent who made the false identification acted intentionally or recklessly in that regard. The fact that the agent, after viewing the videotape, realized his mistake and brought this to the attention of the prosecutor (who immediately dismissed that count of the indictment) would strongly imply the contrary.

Defendant further argues that the wiretap information should be suppressed because the Government did not demonstrate the necessity of a wiretap in the affidavit. This determination is reviewed under an abuse of discretion standard. *See Zambrana*, 841 F.2d at 1329-30. As long as a factual predicate existed in finding that normal investigatory procedures were unlikely to be successful, the wiretap material should not be suppressed. *See Zambrana*, 841 F.3d at 1330.

To establish necessity, the Government need only meet one of three requirements of 18 U.S.C. § 2518(3) regarding normal investigative procedures: (1) they have been tried and failed, (2) they reasonably appear to be unlikely to succeed if tried, or (3) they reasonably appear to be too dangerous. *See Zambrana*, 841 F.3d at 1329. The burden of establishing compliance with these requirements is not great and must be reviewed in a practical and common sense manner. *Zambrana*, 841 F.2d at 1329. Wiretaps do not have to be the last resort of the Government. *Zambrana*, 841 F.2d at 1329.

As discussed above, paragraphs 42 through 59 of the affidavit explained in sufficient detail why normal investigatory techniques were unlikely to be successful for two reasons under § 2518(3)(c): (1) they had been tried and failed and (2) they reasonably appear to be unlikely to succeed if tried. Defendant's argument, that these reasons are just boilerplate statements that do not have the requisite factual specificity to justify the necessity of a Title III wiretap in this case, is unpersuasive.

The Government has gone beyond boilerplate allegations by citing specific facts. For example, the Government explained that Defendant and other conspirators became more surveillance conscious after the seizure of the $10,000.00 drug payment. Defendant also became more leery of Smith after the seizure. Defendant did not like to discuss the conspiracy in detail

12

unless it involved a particular transaction, and neither Smith nor the cooperating witness had any information regarding the leaders of the conspiracy. Further, the recordings made by the cooperating witness and Smith were very short, only concerned discrete drug transactions, and did not identify the leaders of the conspiracy.

Based on the above, there was no abuse of discretion in finding that it was necessary to grant the Title III application.

*Motion to Dismiss the Grand Jury Indictment*

Lastly, Defendant seeks to dismiss the grand jury indictment based on the August 24, 2001 erroneous identification of Defendant, which resulted in false grand jury testimony which was the basis of Count II of the indictment. Despite the prompt dismissal of Count II by the Government when the error was discovered, Defendant contends the Government's actions were misleading to the extent of a constitutional violation which mandates a dismissal of the entire indictment.

Generally, to dismiss an indictment for prosecutorial misconduct, a defendant must demonstrate: (1) prosecutorial misconduct and (2) that he suffered prejudice from the misconduct. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-55 (1988) (*Bank of Nova Scotia*). Most prosecutorial misconduct errors can be handled through means other than dismissal of the indictment. *See Bank of Nova Scotia*, 487 U.S. at 263. "[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (internal quotations omitted).

In this case, Defendant cannot argue that he suffered prejudice from any prosecutorial conduct because the Government dismissed the defective Count II against the Defendant.

Despite this remedy, Defendant contends that the grand jury's decision to indict Defendant on other counts, including the conspiracy count, would not be supported by the remaining facts. At oral argument, Defendant asked the Court to review the grand jury transcripts to determine whether a factual basis existed for the conspiracy count. The Government had no objection.

The Court has reviewed the relevant portions of the transcripts of the grand jury proceedings *in camera*. The inclusion of the mistaken identification of Defendant in a drug transaction could not have materially affected the grand jury's decision to indict Defendant on the other charges. The facts presented to the grand jury were more than sufficient to support an indictment for the offenses set out in the remaining four counts of the indictment independent of the testimony regarding the August, 24, 2001 occurrence.

Defendant also argues the indictment should be dismissed through the Court's inherent supervisory power to deter future misconduct, contending that the Government agent perjured himself in his testimony of the August 24, 2001 events.

However, misidentification, even by a Government agent with experience in a particular case, does not amount to perjury. *See United States v. Brown*, 347 F.3d 1095, 1097-98 (9th Cir. 2003); *United States v. Moore*, 184 F.3d 790, 794 (8th Cir. 1999); *United States v. Mills*, 995 F.2d 480 (4th Cir. 1993). The Government discovered the error, the Government candidly

admitted the error, and the Government promptly dismissed Count II, the factual basis for which arose out of the error. The Government's conduct in this regard does not invoke any consideration of the need for deterrence.

## CONCLUSION

For the foregoing reasons, Defendant's Motions to dismiss are denied.

Date: April 6, 2005

JOHN W. DARRAH, Judge
United States District Court